UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SHIRLEAN MEADE and ELMER MEADE,

      Plaintiffs,

v.                       Civil Action No. 2:09-cv-00388

DEIDRE E. PARSLEY, D.O.; WYETH,
INC., doing business as Wyeth;
SCHWARZ PHARMA, INC.; PLIVA,
INC.; and JOHN DOE DEFENDANTS
#1-6

      Defendants.

MEMORANDUM OPINION AND ORDER

      Pending is defendant PLIVA, Inc.'s ("PLIVA") motion to dismiss based on federal preemption and its motion for summary judgment, both filed September 10, 2010.

I.  Factual Background

      This action arises out of PLIVA's alleged failure to warn plaintiff Shirlean Meade ("Mrs. Meade") of the potential adverse side-effects of the drug metoclopramide.  PLIVA manufactures, labels, sells, and distributes metoclopramide, the generic equivalent of the brand name drug Reglan.[1]  (Compl. ¶

---

[1]    Plaintiffs and some deponents use the drug names "Reglan" and "metoclopramide" interchangeably.  Inasmuch as this court previously determined that plaintiff has only ingested the generic form of the drug, the court will only refer to the drug as metoclopramide.  See Meade v. Parsley, No. 2:09-cv-00388, slip

12).  Since its approval by the Food and Drug Administration
("FDA") in 1980, metoclopramide has been widely used to treat
gastroesophageal reflux disease ("GRD"), nausea, and
gastroparesis.  (Pl.'s Resp., Ex. 18).

On January 18, 2006, defendant Dr. Deidre Parsley
prescribed metoclopramide to Mrs. Meade in order to treat her
GRD, nausea, and loss of appetite.  (Def.'s Mot. Summ. J., Ex. 2,
Williamson Memorial Hospital Records, 5MEADE00031; Compl. ¶ 34).
Mrs. Meade continued taking metoclopramide until February 2007.
(Def.'s Mem. Supp. Mot. Summ. J. 5).  The parties do not dispute
that PLIVA manufactured the metoclopramide ingested by Mrs.
Meade.

It is undisputed that, during the period when Mrs.
Meade used the drug, PLIVA's metoclopramide packages included
package inserts that contained the following warnings:

Under the heading "DOSAGE AND ADMINISTRATION"

Therapy longer than 12 weeks has not been
evaluated and cannot be recommended.

Under the heading "INDICATIONS AND USAGE" and the subheading

"Symptomatic Gastroesophageal Reflux"

Metoclopramide tablets are indicated as
short-term (4 to 12 weeks) therapy for adults
with symptomatic, documented gastroesophageal
reflux who fail to respond to conventional
therapy.

_____

op. (S.D. W. Va. Nov. 29, 2009).

Under the heading "WARNINGS" and the subheading "Tardive Dyskinesia":

> Tardive Dyskinesia, a syndrome consisting of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with metoclopramide. Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to predict which patients are likely to develop the syndrome. Both the risk of developing the syndrome and the likelihood that it will become irreversible are believed to increase with the duration of treatment and the total cumulative dose.
>
> Less commonly, the syndrome can develop after relatively brief treatment periods at low doses; in these cases, symptoms appear more likely to be reversible.
>
> There is no known treatment for established cases of tardive dyskinesia although the syndrome may remit, partially or completely, within several weeks-to-months after metoclopramide is withdrawn. Metoclopramide itself, however, may suppress (or partially suppress) the signs of tardive dyskinesia, thereby masking the underlying disease process. The effect of this symptomatic suppression upon the long term course of the syndrome is unknown. Therefore, the use of metoclopramide for the symptomatic control of tardive dyskinesia is not recommended.

(See Pl.'s Resp., Ex. 5, metoclopramide tablets label, 2; Def.'s Mem. Supp. Mot. Summ. J. 14).

Mrs. Meade, who is 77 years of age, filled her metoclopramide prescriptions at the Sav-Rite Pharmacy in Kermit, West Virginia. (Id.). She never read any written materials accompanying her metoclopramide prescriptions. (Def.'s Mot.

3

Summ. J., Ex. 11, Meade Dep. 86-87).  Dr. Parsley likewise did

not read PLIVA's metoclopramide package insert or any other

written materials produced by PLIVA before prescribing the drug

to Mrs. Meade.[2]  (Id., Ex. 16, Dr. Parsley Dep. 191-95).  Dr.

Parsley did, however, read the Physician's Desk Reference ("PDR")

for Reglan, which contained the same warnings as the PLIVA

metoclopramide package insert.  (See id., Dr. Parsley Dep. 194;

Pl.'s Resp. 12).

    Between February 2007 and February 2008, Mrs. Meade

began experiencing involuntary facial tremors.  (Pl.'s Resp., Ex.

---

[2]    Specifically, Dr. Parsley testified as follows:

    Q.    Okay.   At any time prior to prescribing the
          metoclopramide to Mrs. Meade, did you ever review a
          product information that you knew was produced by
          Pliva?
                              * * *
    A.    Not that I recall.

    Q.    Okay.  Is it fair to say that throughout the entire
          time you were prescribing metoclopramide for Mrs.
          Meade, you never recall seeing any type of written
          information about metoclopramide that was published
          by Pliva?
                              * * *
    A.    Again, I don't recall seeing anything by Pliva.

(Def.'s Mot. Summ. J., Ex. 16, Dr. Parsley Dep. 192).

    Although Dr. Parsley's testimony that she did not "recall"
reading any PLIVA labeling could be characterized as equivocal,
plaintiffs do not dispute that Dr. Parsley never read PLIVA's
warning.  (See Pl.'s Resp. 11-13 (addressing PLIVA's argument
that Dr. Parsley never read the PLIVA labeling without disputing
the underlying factual assertion)).  In any event, the strong
import of Dr. Parsley's testimony, taken as a whole, is that she
read the PDR for Reglan but did not read the package insert for
metoclopramide.

2, Dr. Patnaik Dep. 58).  Although several physicians observed
these tremors, the first doctor to diagnose Mrs. Meade with
metoclopramide-induced tardive dyskinesia was Dr. Douglas Deitch,
a neurologist.  Based on his two examinations of Mrs. Meade --
one in December 2008 and another in March 2009 -- Dr. Deitch
testified as follows:

> Q.   Okay. Now, based on your two visits with Mrs.
>       Meade, did you ever make any type of diagnosis of
>       her involuntary movement disorder?
>
> A.   Well, other than what I've stated as far as the
>       tardive dyskinesia.
>
> Q.   Did you determine a cause for her tardive
>       dyskinesia?
>
> A.   Well, I felt it was secondary to the Reglan
>       [metoclopramide] she used in the past.

(Pl.'s Resp., Ex. 1, Dr. Deitch Dep. 17).  Dr. Deitch also ruled
out other potential causes of Mrs. Meade's symptoms:

> Q.   Now, were there any things you were able to rule
>       out in regard to Mrs. Meade's tardive dyskinesia?
>
> A.   Well, yeah, I ruled out stroke, I ruled out
>       aneurysm, I ruled out brain tumor, I ruled out
>       Parkinson's disease, those things.

(Id. 19).

On February 26, 2009, the FDA required manufacturers of
metoclopramide to insert a black box warning on the drug's
labeling that would "alert physicians of the risk of tardive
dyskinesia with chronic use of metoclopramide."  (Pl.'s Resp.,
Ex. 7, Letter from Public Health Service, Food and Drug
Administration, 2).  PLIVA complied with this directive and

changed its metoclopramide package insert accordingly.  (Def.'s

Reply 10).  The black box warning states as follows:

> WARNING: TARDIVE DYSKINESIA
>
> Chronic treatment with metoclopramide can cause tardive dyskinesia, a serious movement disorder that is often irreversible. The risk of developing tardive dyskinesia increases with the duration of treatment and the total cumulative dose. The elderly, especially elderly women, are most likely to develop this condition.
>
> Metoclopramide therapy should routinely be discontinued in patients who develop signs or symptoms of tardive dyskinesia. There is no known treatment for tardive dyskinesia; however, in some patients symptoms may lessen or resolve after metoclopramide treatment is stopped.
>
> Prolonged treatment (greater than 12 weeks) with metoclopramide should be avoided in all but rare cases where therapeutic benefit is thought to outweigh the risks to the patient of developing tardive dyskinesia.

(Id.).

By way of comparison, the PLIVA package insert noted that the risks of usage increased with the duration of treatment and total dosage, that metoclopramide is indicated as short term (4 to 12 weeks) therapy for GRD, and that usage beyond 12 weeks has not been evaluated and is not recommended.  The 2009 FDA warning is somewhat more specific as to duration of use by directing that prolonged treatment greater than 12 weeks should be avoided in all but rare cases.  It also directs that the warning be displayed in bold type in a box rimmed with a black border.  Save for the placement of the warning in a black box,

6

the length of usage warning given by PLIVA largely approaches
that of the 2009 FDA warning.[3]

## II.   Procedural History

        Mrs. Meade and her husband Elmer Meade ("Mr. Meade")
(collectively "plaintiffs") initiated this action in the Circuit
Court of Mingo County, West Virginia on February 25, 2009.
Defendants removed on April 20, 2009, invoking the court's
diversity jurisdiction.  Plaintiffs assert 13 counts (Nos. 2
through 14) against PLIVA in their complaint, all of which are
based on the following material allegations: (1) defendants
"fail[ed] to warn doctors and patients of information within its
knowledge or possession or both, which indicated . . . [that
metoclopramide], when taken for long periods of time, caused
serious, permanent, and debilitating side effects, including
Tardive Dyskinesia and Akathisia"; and (2) defendants "marketed,
manufactured and distributed [metoclopramide] and <u>encouraged</u> the

---

[3]    Plaintiffs also contend that PLIVA's warnings were
inadequate in that they misleadingly invited long term use that
has never been approved by the FDA, but the court notes that the
PLIVA warning did state that therapy longer than 12 weeks has not
been evaluated and cannot be recommended.  In addition,
plaintiffs claim that the warnings downplayed the seriousness and
potential irreversibility of the risk of tardive dyskinesia in
long term use, but the PLIVA warning did state that the risk is
highest among the elderly, especially elderly women, and that the
likelihood of irreversibility is believed to increase with the
duration of treatment and the total cumulative dose.  The court's
ruling on PLIVA's summary judgment motion renders any further
discussion of these contentions unnecessary, however.

7

long term use of these drugs, <u>misrepresented</u> the effectiveness of the drugs and <u>concealed</u> the drugs's dangerous side effects." (Compl. ¶¶ 23-24) (emphasis in original).[4]

Counts 2 through 14 are asserted against the "manufacturing defendants," which includes PLIVA.  Count 2 is a strict products liability claim; Count 3 is a manufacturing defect strict liability claim; Count 4 is a design defect strict liability claim; Count 5 is a breach of express warranty claim; Count 6 is a breach of implied warranty claim; Count 7 is a negligence claim; Count 8 is a negligent misrepresentation claim; Count 9 is a claim for breach of undertaking a special duty; Count 10 is a fraud and misrepresentation claim; Count 11 is a constructive fraud claim; Count 12 is a fraud by concealment claim; Count 13 is a claim for violation of the West Virginia Unfair Trade Practices Act; and Count 14 is an intentional infliction of emotional distress claim.  (<u>Id.</u> ¶¶ 108-199).

---

[4]     The alleged connection between long-term use of metoclopramide and neurological disorders is not unique to this case.  Many patients who have been prescribed a form of metoclopramide developed neurological disorders and subsequently brought suit against the manufacturers of the drug.  <u>See, e.g.</u>, <u>McNeil v. Wyeth</u>, 462 F.3d 364, 364 (5th Cir. 2006); <u>In re Reglan/Metoclopramide Prod. Liab. Litig.</u>, 622 F. Supp. 2d 1380 (U.S.J.P.M.L. 2009); <u>Stoddard v. Wyeth</u>, Inc., 630 F. Supp. 2d 631 (E.D.N.C. 2009); <u>Fields v. Wyeth, Inc.</u>, 613 F. Supp. 2d 1056 (W.D. Ark. 2009); <u>Schrock v. Wyeth, Inc.</u>, 601 F. Supp. 2d 1262 (W.D. Okla. 2009); <u>Wilson v. PLIVA, Inc.</u>, 640 F. Supp. 2d 879 (W.D. Ky. 2009); <u>Kellogg v. Wyeth</u>, 612 F. Supp. 2d 421 (D. Vt. 2008); <u>Demahy v. Wyeth Inc.</u>, 586 F. Supp. 2d 642 (E.D. La. 2008); <u>Morris v. Wyeth</u>, 582 F. Supp. 2d 861 (W.D. Ky. 2008); <u>Mensing v. Wyeth, Inc.</u>, 562 F. Supp. 2d 1056 (D. Minn. 2008); <u>Swicegood v. Pliva, Inc.</u>, 543 F. Supp. 2d 1351 (N.D. Ga. 2008).

Plaintiffs seek recovery for actual damages, punitive damages, loss of consortium, and reasonable costs and attorneys fees.  (<u>Id.</u> ¶¶ 200-208).

On September 10, 2010, PLIVA filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) and a motion for summary judgment pursuant to Rule 56.  In its motion for summary judgment and supporting memorandum, PLIVA contends there are no genuine issues of material fact inasmuch as (1) plaintiffs cannot establish causation; (2) Dr. Parsley was aware of the risks of using metoclopramide when she prescribed the drug to Mrs. Meade; (3) PLIVA satisfied any alleged duty to warn by providing a package insert explaining potential side effects of metoclopramide; (4) PLIVA's product was reasonably safe for its intended use; (5) plaintiffs have not satisfied their burden of proof on their claims for breach of warranty, fraud, violation of West Virginia Unfair Trade Practices Act, and emotional distress; and (6) West Virginia law does not recognize any special duty by a pharmaceutical company to a consumer.  (<u>See</u> <u>generally</u> Def.'s Mem. Supp. Mot. Summ. J.).

9

III.  Motion for Summary Judgment

A.   Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not

lead a rational trier of fact to find in favor of the non-movant. **Williams v. Griffin**, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. **Anderson**, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. **Overstreet v. Ky. Cent. Life Ins. Co.**, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, **Russell v. Microdyne Corp.**, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. **Sosebee v. Murphy**, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. **Charbonnages de France v. Smith**, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." **United States v. Diebold, Inc.**, 369 U.S. 654, 655 (1962).

11

B.    Causation

        "Under West Virginia law, a claim for negligence, breach of warranty, and strict liability requires that the element of causation be satisfied." White v. Dow Chem. Co., 321 Fed. App'x 266, 273 (4th Cir. 2009) (citing Tolley v. Carboline Co., 617 S.E.2d 508, 511-12 (W. Va. 2005)).  Since it appears the West Virginia Supreme Court of Appeals has never discussed the various types of causation in a pharmaceutical failure-to-warn action, the court finds it necessary to articulate the precise burden plaintiffs must satisfy to establish causation in this case.

        In a pharmaceutical products liability action, a plaintiff must initially establish both general and specific causation for his injuries.  Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., 189 F. Supp. 2d 482, 485 (S.D. W. Va. 2002).[5] "General causation is whether a substance is capable of causing a

_____

[5]    Although the West Virginia Supreme Court of Appeals has not addressed the issue, it is well-settled that a plaintiff in a toxic tort case must prove both general and specific causation. See Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th Cir. 2007); Norris v. Baxter Healthcare Corp., 397 F.3d 878, 881 (10th Cir. 2005); In re Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1129 (9th Cir. 2002); Bonner v. ISP Techs., Inc., 259 F.3d 924, 928 (8th Cir. 2001); Raynor v. Merrell Pharms., Inc., 104 F.3d 1371, 1376 (D.C. Cir. 1997); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1200 (6th Cir. 1988); Cavallo v. Star Enter., 892 F.Supp. 756, 771 (E.D. Va. 1995), aff'd in relevant part, rev'd in part, 100 F.3d 1150, 1159 (4th Cir. 1996); see also In re Bausch & Lomb Inc. Contacts Lens Solution Prods. Liab. Litig., 693 F. Supp. 2d 515, 518 (D.S.C. 2010) ("it appears that the concept of general causation as a necessary precursor to proving specific causation is the rule in all jurisdictions.").

12

particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." _In re Rezulin Prods. Liab. Litig._, 369 F. Supp. 2d 398, 402 (S.D.N.Y. 2005) (citing, among others, _In re Hanford Nuclear Reservation Litig._, 292 F.3d 1124, 1129 (9th Cir. 2002) and _Bonner v. ISP Techs., Inc._, 259 F.3d 924, 928 (8th Cir. 2001)).  "General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease." _Id._ (quoting Mary Sue Henifin, et al., Reference Guide on Medical Testimony, in _Reference Manual on Scientific Evidence_ 439, 444 (Fed. Jud. Ctr., 2d ed. 2000)).

In addition to general and specific causation, plaintiffs must establish proximate causation.  _See Weilbrenner v. Teva Pharms., Inc._, 696 F. Supp. 2d 1329, 1342 (M.D. Ga. 2010); _Swicegood v. PLIVA, Inc._, 2010 WL 1138455, at *3-*4 (N.D. Ga. Mar. 22, 2010) ("In products liability cases involving drug side effects, the plaintiff has the burden of showing general and specific causation . . . the plaintiff also must show that the defendant's actions were the proximate cause of her injury.").  To show proximate causation in a failure-to-warn case based on an allegedly inadequate drug label, a plaintiff must show that a different label or warning would have avoided the plaintiff's injuries.  _Id._

13

Thus, a plaintiff seeking to establish causation in a
pharmaceutical failure-to-warn case must show three things: (1)
the drug is capable of causing the injury, (2) the drug did in
fact cause the injury, and (3) a different warning would have
avoided the injury.

1.   General Causation

As an initial matter, the court must determine whether
plaintiffs have offered evidence of general causation –- that is,
whether plaintiffs have shown that metoclopramide is capable of
causing tardive dyskinesia in the general population.  PLIVA
contends, and plaintiffs do not dispute, that none of plaintiffs'
retained experts have offered any opinions regarding general
causation.  (Def.'s Mem. Supp. Mot. Summ. J. 10-11).  But
plaintiffs claim that several of Mrs. Meade's treating physicians
(whom plaintiffs refer to as "non-retained experts") testified
regarding the causal link between metoclopramide and tardive
dyskinesia.  (Pl.'s Resp. 10).  In response, PLIVA maintains that
since these non-retained experts have not provided written
reports, they "may testify only as to their scope and treatment of
Mrs. Meade" and therefore "may not offer any opinions regarding
general causation."  (Def.'s Mem. Supp. Mot. Summ. J. 10-11).
Consequently, PLIVA asserts, "plaintiffs' claims necessarily must

14

fail because they do not have the requisite expert testimony."
(<u>Id.</u>).

        a.   Treating Physicians' Testimony

        The court need not reach the question of whether
it is <u>permissible</u> for Mrs. Meade's treating physicians to opine as
to general causation because, contrary to plaintiffs' assertions,
it appears that none of these physicians <u>have</u> testified as to
general causation.  Plaintiffs first rely on the deposition
testimony of Dr. Deitch, earlier quoted, citing the following
passage:

     Q.   Did you determine a cause for her tardive
           dyskinesia?

     A.   Well, I felt it was secondary to the Reglan
           [metoclopramide] she used in the past.

(Pl.'s Resp., Ex. 1, Dr. Deitch Dep. 17).  This testimony is
relevant to specific, not general, causation.  Indeed, rather
than stating whether "a substance is capable of causing a
particular injury or condition in the general population," Dr.
Deitch's testimony concerned how a "substance caused a particular
individual's injury."  <u>In re Rezulin</u>, 369 F. Supp. 2d at 402
(citations ommitted).  Of course, in opining on specific
causation, Dr. Deitch necessarily assumed the existence of
general causation (i.e., in testifying that metoclopramide <u>did</u>
cause Mrs. Meade's tardive dyskinesia, Dr. Deitch assumed that

15

metoclopramide <u>can</u> cause tardive dyskinesia as a general matter).
But this mere assumption does not establish general causation.

Plaintiffs next cite the following deposition testimony
of Dr. Joby Joseph, a neurologist who treated Mrs. Meade:

> Q.   Okay. By definition, is tardive dyskinesia, given
>      your understanding, a drug induced disorder?
>
> A.   That's right.
>
>                      * * *
>
> Q.   I know you mentioned earlier that you did not
>      diagnose her with tardive dyskinesia?
>
> A.   That's right.
>
>                      * * *
>
> Q.   Do you have an opinion as to whether her taking
>      Reglan [metoclopramide] contributed to her
>      movement disorder?
>
> A.   It is one of the drugs that can cause movement
>      disorder. Did I say definitely it is? No, I didn't
>      say that.

(Pl.'s Resp., Ex. 3, Dr. Joseph Dep. 75, 82-83).  Nowhere in this
testimony did Dr. Joseph specifically comment on whether
metoclopramide is capable of causing tardive dyskinesia in the
general population.  Although he stated that the drug "can cause
movement disorder," he did not specify that this "movement
disorder" was tardive dyskinesia.  The fact that Dr. Joseph did
not diagnose Mrs. Meade with tardive dyskinesia further bolsters
the conclusion that his testimony did not concern any causal link
between metoclopramide and tardive dyskinesia.

Finally, plaintiffs cite the following deposition testimony of Dr. Samrina Hanif, another neurologist who treated Mrs. Meade:

Q.    Okay.  But people do make diagnosis of tardive dyskinesia, correct?

A.    Yes.

Q.    And doctors do, from taking histories, talking to patients, looking at records, make a determination as to what caused tardive dyskinesia, don't they?

A.    They speculate, yes.

Q.    Can they make a diagnosis that a drug such as Reglan can cause tardive dyskinesia?

A.    They can speculate, yes.

Q.    But can they not make a diagnosis?

A.    100 percent, they cannot.  I don't think so.  They can be -- they can state it with possibility.

Q.    Can they state whether that it's more likely than not that Reglan causes tardive dyskinesia?

A.    It's a possibility.

(Pl.'s Resp., Ex. 4, 83).  Dr. Hanif only testified that there is "a possibility" that a doctor could "state whether it's more likely than not that Reglan causes tardive dyskinesia."  (Id.). To be sure, she did not testify about a general causal link between metoclopramide and tardive dyskinesia.

Even if Mrs. Meade's treating physicians did make some passing references to a general causal link between metoclopramide and tardive dyskinesia, this would not be

17

sufficient evidence of causation to survive summary judgment.  As
the West Virginia Supreme Court of Appeals has stated, "the law
is clear that a mere possibility of causation" and, more
specifically, "indeterminate expert testimony on causation that
is based solely on possibility . . . is not sufficient to allow a
reasonable juror to find causation."  Tolley v. ACF Indus., Inc.,
575 S.E.2d 158, 168 (W. Va. 2002).  Rather, an expert's opinion
as to causation must be stated in terms of "reasonable
probability."  Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 972
(4th Cir. 1990) (citing Hovermale v. Berkeley Springs Moose Lodge
No. 1483, 271 S.E.2d 335, 340 (W. Va. 1980)); see also Sakaria v.
Transworld Airlines, 8 F.3d 164, 172-73 (4th Cir. 1993) ("In a
long line of decisions in this circuit, we have emphasized that
proof of causation must be such as to suggest 'probability'
rather than mere 'possibility,' precisely to guard against raw
speculation by the fact finder.").

          Inasmuch as Mrs. Meade's treating physicians have
offered no testimony –- let alone testimony stated in terms of
reasonable probability –- regarding the general causal link
between metoclopramide and tardive dyskinesia, plaintiffs have
failed to provide any expert scientific testimony through her
treating physicians as to general causation.

b.    Other Possible Evidence of General Causation

As an additional basis for general causation,
plaintiffs rely on PLIVA's admission "that its own package
inserts and brand name warnings at least acknowledged the causal
link" between metoclopramide and tardive dyskinesia.  (Pl.'s
Resp. 9-10).  Plaintiffs cite no authority for the proposition
that a plaintiff in a pharmaceutical products liability case can
satisfy his burden of proving general causation by relying on the
defendant manufacturer's drug label warnings.  Moreover, this
contention is undermined by the general principle that causation
evidence in toxic tort cases must be in the form of expert
scientific testimony.  See Rider v. Sandoz Pharms. Corp., 295
F.3d 1194, 1197 (11th Cir. 2002) ("Toxic tort cases . . . are won
or lost on the strength of the scientific evidence presented to
prove causation."); Farris v. Intel Corp., 493 F. Supp. 2d 1174,
1186 (D.N.M. 2007) ("Expert testimony is necessary . . . since
this is a toxic tort lawsuit") (citing Mitchell v. Gencorp. Inc.,
165 F.3d 778, 784 (10th Cir. 1999)); Mancuso v. Consol. Edison
Co. of New York, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997) (holding
that expert testifying as to general causation must demonstrate
that, "according to scientific literature, levels of the toxin
comparable to those received by the plaintiff can cause the
specific types of injuries he alleges.").  PLIVA's drug label,
which merely warns of metoclopramide's potential side-effects

19

without explaining the scientific basis for the warning, is no
substitute for expert testimony that establishes causation in
terms of reasonable probability.

            Plaintiffs also cite, as evidence of general causation,
the subsequent 2009 FDA directive requiring drug manufacturers to
insert a black box warning on metoclopramide labels to convey a
greater risk of tardive dyskinesia.  (Pl.'s Resp. 10).  Again,
plaintiffs cite no authority supporting this contention.  Several
courts have, however, rejected reliance on agency determinations
as a basis for general causation.  See Allen v. Pennsylvania
Eng'g Corp., 102 F.3d 194, 198 (5th Cir. 1996) ("Regulatory and
advisory bodies . . . utilize a 'weight of the evidence' method
to assess the carcinogenicity of various substances in human
beings . . . The agencies' threshold of proof is reasonably lower
than that appropriate in tort law"); Dunn v. Sandoz Pharms.
Corp., 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003) (holding that FDA
determination was insufficient evidence of general causation;
reasoning that "[t]he FDA is concerned with safety and risk
benefit analysis . . . The FDA balanced Parlodel's possible harm
against its limited beneficial use.  The FDA's balancing does not
demonstrate that Parlodel may cause stroke in postpartum
women.").  Inasmuch as the cost-benefit balancing employed by the
FDA differs from the threshold standard for establishing
causation in tort actions, this court likewise concludes that the
FDA-mandated tardive dyskinesia warning cannot establish general

                              20

causation in this case.  Plaintiffs have therefore failed to provide any evidence of general causation.[6]

### 2.   Proximate Causation

Even assuming plaintiffs could establish both general and specific causation, the court determines that plaintiffs have nonetheless failed to provide evidence of proximate causation. Plaintiffs' claims for negligence, breach of warranty, and strict liability require proof of proximate causation.[7]  Generally speaking, "'[p]roximate cause' must be understood to be that cause which in actual sequence, unbroken by any independent

---

[6]   The court acknowledges that the general causal link between metoclopramide and tardive dyskinesia has been established through expert testimony in other cases, see, e.g., Swicegood v. PLIVA, Inc., 2010 WL 1138455, at *3 (N.D. Ga. Mar. 22, 2010), though it is rarely challenged in the first place.  As a consequence, the court would have considered granting plaintiffs leave to file an expert report regarding general causation before dismissing their claims.
The court also notes that Dr. Deitch's testimony appears to have raised a genuine issue of fact as to specific causation. However, the court's ruling on proximate causation grounds renders any further discussion of these issues unnecessary.

[7]   See Aikens v. Debow, 208 W. Va. 486, 491, 541 S.E.2d 576, 581 (2000) (discussing requirement of proximate cause in negligence cause of action); City Nat'l. Bank of Charleston v. Wells, 181 W. Va. 763, 771, 384 S.E.2d 374, 382 (1989) (discussing requirement of proximate cause in breach of warranty cause of action); Ilosky v. Michelin Tire Corp., 172 W. Va. 435, 443, 307 S.E.2d 603, 611 (1983) (discussing requirement of proximate cause in failure to warn cause of action); Morningstar v. Black & Decker Mfg. Co., 162 W. Va. 857, 883, 253 S.E.2d 666, 680 (1979) (discussing requirement of proximate cause in strict liability cause of action).

cause, produced the wrong complained of, without which the wrong would not have occurred." Wilkinson v. Duff, 212 W. Va. 725, 731, 575 S.E.2d 335, 341 (2002) (citations omitted).  The West Virginia Supreme Court of Appeals has held that the following jury instruction accurately states the proximate causation standard in failure-to-warn cases:

> In order to recover under a failure to warn theory, plaintiff must prove by a preponderance of the evidence that the lack or inadequacy of warnings in the 1988 Chevrolet Celebrity proximately caused Douglas Tracy's death. GM may only be liable to petitioner for failure to warn where there is evidence that a warning would have made a difference. Therefore, plaintiff must prove that the lack of a warning regarding the seat belts in the 1988 Chevrolet Celebrity proximately caused Douglas Tracy's death, and that the presence of a warning would have prevented his death. Plaintiff must establish that the warning suggested by plaintiff would have caused Douglas Tracy to act differently or otherwise change his behavior in a manner which would have avoided his death. If you find that a warning by GM would not have prevented Douglas Tracy's death, then you must find in favor of GM.

Tracy v. Cottrell, 206 W. Va. 363, 524 S.E.2d 879 n.9 (1999) (emphasis added).  The court views this standard as particularly instructive because plaintiffs' negligence, breach of warranty, and strict liability claims are all premised on a failure-to-warn theory of liability.

        The court must initially address whether PLIVA's duty to warn ran to Mrs. Meade or Dr. Parsley, as this affects the proximate causation analysis.  The majority of states follow the learned intermediary doctrine, which provides that "the duty of the manufacturer to warn is owed to the prescribing physician not

the ultimate consumer -- the patient."  <u>Ashworth v. Albers</u>
<u>Medical, Inc.</u>, 395 F. Supp. 2d 395, 407 (S.D. W. Va. 2005).  But,
as the parties acknowledge, the West Virginia Supreme Court of
Appeals has rejected the learned intermediary doctrine and has
instead held that "manufacturers of prescription drugs are
subject to the same duty to warn consumers about the risks of
their products as other manufacturers."  Syl. Pt. 3, <u>State ex</u>
<u>rel. Johnson & Johnson Corp. v. Karl</u>, 220 W. Va. 463, 647 S.E.2d
899 (2007).  Following <u>Karl</u>, the West Virginia Supreme Court
has not had occasion to clarify whether a drug manufacturer must
warn both the patient and the physician, or just the patient.
The court need not resolve this issue in evaluating proximate
causation, however, because the undisputed evidence shows that an
adequate warning would not have changed either Mrs. Meade's or
Dr. Parsley's behavior in a manner which would have avoided Mrs.
Meade's injury.

        Mrs. Meade testified that she never read PLIVA's
package insert or any other documents accompanying her
metoclopramide prescription.  (<u>See</u> Def.'s Mot. Summ. J., Ex. 11,
Meade Dep. 86-87).  Dr. Parsley likewise testified that she did
not read PLIVA's metoclopramide warning.  (<u>See</u> <u>id.</u>, Ex. 16, Dr.
Parsley Dep. 191-95).  And while Dr. Parsley did read the PDR for
Reglan, it is undisputed that PLIVA did not create that PDR.
(<u>See</u> <u>id.</u>, Ex. 16, Dr. Parsley Dep. 191; Pl.'s Resp. 12).  Many
courts have declined to find proximate causation in

23

pharmaceutical failure-to-warn suits when the patient (or the
prescribing physician if the learned intermediary doctrine is
applicable) did not read the defendant manufacturer's allegedly
inadequate warning.[8]  These courts reasoned that if the patient
or physician did not read the drug warning in the first instance,
then there is no basis for finding that a stronger warning would
have affected their behavior.

        The parties acknowledge that in <u>Tracey</u>, the West
Virginia Supreme Court recognized the need to show that "a
warning would have made a difference."  524 S.E.2d at n.9.
Plaintiffs add that "[w]here an individual testifies that her
behavior would have changed if a different warning had been
provided, this is sufficient to create a question of fact for the
jury in a failure to warn case."  (Pl.'s Resp. 11).  Based on

_____

[8]     <u>See, e.g.</u>, <u>Motus v. Pfizer Inc.</u>, 358 F.3d 659, 661 (9th
Cir. 2004) (affirming summary judgment based on lack of
causation; reasoning that stronger warnings would not have
changed patient's treatment since prescribing physician
"testified that he did not read the warning label"); <u>Porterfield
v. Ethicon, Inc.</u>, 183 F.3d 464, 468 (5th Cir. 1999) (same); <u>In re
Zyprexa Prods. Liab. Litig.</u>, 2009 WL 1514628, at *12 (E.D.N.Y.
2009) (applying West Virginia law and finding no proximate
causation; reasoning that "[b]ecause there is no evidence that
[plaintiff] ever read any of defendant's warnings of possible
risks from Zyprexa, there is no evidence from which a jury could
find that a different warning by [the drug manufacturer] would
have prevented him from taking Zyprexa"); <u>see also</u> <u>Shanklin v.
Allis-Chalmers Mfg. Co.</u>, 254 F. Supp. 223 (S.D. W. Va. 1966)
(holding that defendant's failure to supply proper operating
manual for harvester did not proximately cause user's injury
where user had not read manual supplied and would not have read
proper manual if it had been supplied).

24

this standard, plaintiffs maintain they have established proximate causation through Dr. Parsley's deposition testimony, wherein she stated that the heightened metoclopramide warnings imposed by the FDA in February 2009 affected how she communicates with patients about metoclopramide.  (Id.).

        Rather than merely showing that "adequate warnings would have changed behavior," (Pl.'s Resp. 12), plaintiffs must establish that an adequate warning would have changed behavior "in a manner which would have avoided [the plaintiff's injury]," Tracy, 524 S.E.2d at n.9.  Plaintiffs have not met this standard. As an initial matter, the court notes that the effect of the 2009 FDA black box warning on Dr. Parsley's behavior is irrelevant since neither Dr. Parsley nor Mrs. Meade read PLIVA's labeling and therefore would not have seen a heightened warning even if it had been implemented by PLIVA.  Even assuming they had read PLIVA's labeling, Dr. Parsley's testimony does not show that a heightened warning like the one mandated by the FDA would have made a difference.  While Dr. Parsley testified that she would have discussed the 2009 FDA black box warning with Mrs. Meade had that information been available when she prescribed the drug in 2006, she also indicated that she did discuss the risk of tardive dyskinesia when she originally prescribed metoclopramide to Mrs. Meade.[9]  In addition, Dr. Parsley did not testify that the

_____

[9]     (See Pl.'s Resp., Ex. 8, Dr. Parsley Dep. 98 ("A.  I would have discussed -- again, you know, the black box is

heightened FDA warning, if implemented in 2006, would have prevented her from prescribing the drug to Mrs. Meade.   Thus, Dr. Parsley's testimony does not establish that a different warning from PLIVA would have affected her behavior in a manner that would have avoided Mrs. Meade's injury.[10]

In sum, plaintiff did not read the PLIVA labeling when she used metoclopramide in 2006 and 2007 and neither did Dr. Parsley.   Even if PLIVA had set forth a heightened warning in its labeling, neither plaintiff nor Dr. Parsley would have seen it. And so, a stronger warning by PLIVA would not have affected the behavior of either plaintiff or Dr. Parsley.   Plaintiffs have therefore failed to carry their burden of establishing proximate causation.

---

basically stating what the risks are for Tardive Dyskinesia, and I certainly would have discussed that with her.   But, again, you know, I believe we discussed -- I believe we would have discussed Tardive Dyskinesia when I prescribed it") (emphasis added)).

[10]   Plaintiffs cite Salmon v. Parke, Davis & Co., 520 F.2d 1359 (4th Cir. 1975) for the proposition that "reliance on a faulty label is not required in order to establish proximate causation." (Pl.'s Resp. 11).   While the Fourth Circuit noted in its recitation of facts that the patient did not read the allegedly inadequate drug warning, the court did find that the prescribing physician had read it.   Since the plaintiffs' claims were based on the defendant's failure to warn physicians of the drug's hazards, and since the physician in Salmon had read the defendant's allegedly inadequate warning, there was no occasion for the court to find, as plaintiffs suggest, that reliance on a faulty label is not required in order to establish proximate causation.   Here, neither Mrs. Meade nor Dr. Parsley read PLIVA's metoclopramide warning.   Salmon is inapposite.

Inasmuch as plaintiffs have offered no evidence of proximate causation, PLIVA is entitled to summary judgment as to all of plaintiffs' claims that require proof of causation.  As noted above, "[u]nder West Virginia law, a claim for negligence, breach of warranty, and strict liability requires that the element of causation be satisfied."  <u>White v. Dow Chem. Co.</u>, 321 Fed. App'x 266, 273 (4th Cir. 2009) (citing <u>Tolley v. Carboline Co.</u>, 617 S.E.2d 508, 511-12 (W. Va. 2005)).  Accordingly, the court grants summary judgment to PLIVA as to the following seven counts of plaintiffs' complaint: Count 2 (strict products liability), Count 3 (manufacturing defect strict liability), Count 4 (design defect strict liability), Count 5 (breach of express warranty claim), Count 6 (breach of implied warranty claim), Count 7 (negligence), and Count 9 (breach of undertaking a special duty).

C.    Fraud, Misrepresentation, and West Virginia Unfair Trade
      Practices Act Claims

PLIVA contends that plaintiffs' remaining six claims for negligent misrepresentation (Count 8), fraud and misrepresentation (Count 10), constructive fraud, (Count 11), fraud by concealment (Count 12), and for violations of the West Virginia Unfair Trade Practices Act (Count 13) fail as a matter of law because all these claims "require proof of reliance on some representation by PLIVA," and "there is no evidence that

27

Mrs. Meade or Dr. Parsley relied on any statement made by PLIVA."
(Def.'s Reply 18; Def.'s Mem. Supp. Mot. Summ. J. 25-26).   In
response, plaintiffs assert that PLIVA "represented to physicians
and patients that the risk of developing [tardive dyskinesia]
with use of its metoclopramide was 'rare' and occurred in 1 out
of 500 patients," and that "Mrs. Meade and/or her physicians
relied on this information in prescribing her metoclopramide."
(Pl.'s Resp. 27).

        PLIVA correctly observes that reliance is a necessary
element of plaintiffs' fraud-based claims.[11]   Yet, plaintiffs
cite no evidence showing that Mrs. Meade or Dr. Parsley actually
relied on PLIVA's alleged misrepresentations.   (See Pl.'s Resp.

---

[11]     See Syl. Pt. 5, Kidd v. Mull, 595 S.E.2d 308 (W. Va. 2004)
(recognizing reliance as element of fraud claim); Ochala v.
Dyncorp Intern. LLC, No. 08-1027, 2009 WL 4152966, at *5 (S.D. W.
Va. Nov. 23, 2009) (citing Folio v. City of Clarksburg, 655
S.E.2d 143, 151 (W. Va. 2007)) (recognizing "justifiable
reliance" as element of negligent misrepresentation claim);
Harless v. CSX Hotels, Inc., 265 F. Supp. 2d 620, 651 n.12 (S.D.
W. Va. 2003) (citing Gum v. Dudley, 505 S.E.2d 391, 402 (W. Va.
1997)) (noting that plaintiff alleging constructive fraud must
show he "acted on" [i.e., relied upon] misrepresentation);
Livingston v. K-Mart Corp., 32 F. Supp. 2d 369, 374 (S.D. W. Va.
1998) (citing Kessel v. Leavitt, 511 S.E.2d 720, 763 (W. Va.
1998)) ("Fraudulent concealment requires some affirmative action,
designed or intended to prevent, and which does prevent [i.e.,
induces reliance], the discovery of facts giving rise to the
fraud claim.") (emphasis added); Knapp v. Americredit Fin.
Servs., Inc., 245 F. Supp. 2d 841, 852 (S.D. W. Va. 2003) (citing
Orlando v. Finance One of West Virginia, Inc., 369 S.E.2d 882,
888 (W. Va. 1988)) (noting that plaintiffs seeking damages under
W. Va. Code § 46A-6-106(1) must prove they have suffered an
"ascertainable loss . . . as a result of the use of the unfair
act or practice of which they complain.") (emphasis added).

27-28).  Indeed, as discussed above, the undisputed evidence
shows that neither Mrs. Meade nor Dr. Parsley read or relied upon
PLIVA's package insert or any other representations made by
PLIVA.  (<u>See</u> Def.'s Mot. Summ. J., Ex. 11, Meade Dep. 86-87; <u>id.</u>,
Ex. 16, Dr. Parsley Dep. 191-95).  Although Dr. Parsley read the
PDR for Reglan, it is undisputed that PLIVA did not create that
PDR.  (<u>See id.</u>, Ex. 16, Dr. Parsley Dep. 191; Pl.'s Resp. 12).
Because plaintiffs have offered no evidence showing that they
relied on PLIVA's representations, the court grants summary
judgment as to Count 8 (negligent misrepresentation), Count 10
(fraud and misrepresentation), Count 11 (constructive fraud),
Count 12 (fraud by concealment), and Count 13 (violation of West
Virginia Unfair Trade Practices Act).

D.   Intentional Infliction of Emotional Distress Claim

          PLIVA next asserts that plaintiffs' Count 14 claim for
intentional infliction of emotional distress fails "because Mrs.
Meade does not suffer from severe emotional distress."  (Def.'s
Mem. Supp. Mot. Summ. J. 27).  Although plaintiffs maintain that
they "have a viable claim for intentional infliction of emotional
distress," they do not respond to PLIVA's assertion.

          Under West Virginia law, a plaintiff must establish the
following four elements to prevail on an intentional infliction
of emotional distress claim:

                              29

> "(1) that the defendant's conduct was atrocious,
> intolerable, and so extreme and outrageous as to exceed
> the bounds of decency; (2) that the defendant acted
> with the intent to inflict emotional distress, or acted
> recklessly when it was certain or substantially certain
> emotional distress would result from his conduct; (3)
> that the actions of the defendant caused the plaintiff
> to suffer emotional distress; and (4) that the
> emotional distress suffered by the plaintiff was so
> severe that no reasonable person could be expected to
> endure it."

Syl. Pt. 2, <u>Philyaw v. Eastern Assoc. Coal Co.</u>, 633 S.E.2d 8 (W.
Va. 2006) (quoting Syl. Pt. 3, <u>Travis v. Alcon Labs.</u>, 504 S.E.2d
419 (W. Va. 1998)).  In their response, plaintiffs do not contend
that Mrs. Meade suffers from severe emotional distress.  (<u>See</u>
Pl.'s Resp. 27-28).  Nor does the record contain any evidence
which shows that Mrs. Meade suffers from severe emotional
distress.  PLIVA is therefore entitled to summary judgment as to
plaintiffs' intentional infliction of emotional distress claim
(Count 14).

E.  Loss of Consortium and Punitive Damages

        Lastly, PLIVA asserts that plaintiffs' claims for loss
of consortium and punitive damages should be dismissed.  (Def.'s
Mem. Supp. Mot. Summ. J. 28-30).  Inasmuch as these "claims" are
wholly dependent upon the success of plaintiffs' primary claims,
which the court has determined fail as a matter of law, PLIVA is
entitled to summary judgment as to plaintiffs' loss of consortium
claim and their request for punitive damages.

30

IV.   Conclusion


Based on the foregoing, the court ORDERS as follows:

1.    That PLIVA's motion for summary judgment be, and it
      hereby is, granted, and PLIVA is dismissed from this
      action.

2.    That PLIVA's motion to dismiss based on federal
      preemption be, and it hereby is, denied without
      prejudice as moot.


The Clerk is directed to forward a copy of this written
opinion and order to counsel of record and any unrepresented
parties.

DATED: November 24, 2010


John T. Copenhaver, Jr.
United States District Judge


31