```
                 UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON
```

**SHIRLEAN MEADE and ELMER MEADE,**

        **Plaintiffs,**

**v.**                                            **Civil Action No. 2:09-cv-00388**

**DEIDRE E. PARSLEY, D.O.,**

        **Defendant.**

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is the motion for summary judgment of defendant Deidre E. Parsley, D.O. ("Dr. Parsley"), initially filed on December 28, 2010, and renewed on March 21, 2011.

I.  Background

Dr. Parsley was plaintiff Shirlean Meade's physician. On January 18, 2006, she prescribed the drug metoclopramide to Meade to alleviate her nausea symptoms. A side effect of this drug is tardive dyskinesia, a disorder consisting of potentially irreversible and involuntary movements. Over the next year Meade had about three subsequent office visits with Dr. Parsley, who continued to prescribe the same drug for her. At the time of two more visits office visits on February 8 and February 20, 2007, Dr. Parsley performed neurological exams on Meade, both of which, she found, proved negative for movement disorder symptoms.

In the "first part" of February 2007, Meade's daughter, Tammie Vance, noticed tremors in her mother's jaw.  One of Meade's physicians, Dr. Ashok Patnaik, also observed these facial tremors in a visit on February 27, 2007.  At Dr. Patnaik's direction, plaintiff stopped taking metoclopramide on that date.

On March 8, 2007, Meade had another routine office visit with Dr. Parsley.  Upon observing Meade's movement disorder symptoms, Dr. Parsley immediately discontinued her metoclopramide regimen, and prescribed the drug Sinemet to treat the symptoms.  This was the last office visit Meade had with Dr. Parsley.  Her facial tremors were later diagnosed as metoclopramide-induced tardive dyskinesia.

Shirlean Meade and her husband Elmer Meade (collectively, "plaintiffs") instituted this action in the Circuit Court of Mingo County, West Virginia on February 25, 2009.  Defendants removed on April 20, 2009, invoking the court's diversity jurisdiction.  The complaint asserts 13 counts against various drug manufacturers[1] and a single count (Count 1) for medical malpractice against Dr. Parsley.  Plaintiffs seek

---

[1] The court granted summary judgment for defendants Wyeth and Schwarz Pharma on November 13, 2009, (Doc. No. 45), and defendant PLIVA on November 24, 2010, (Doc. No. 187).  Dr. Parsley is the only remaining defendant in this action.

recovery for actual damages, punitive damages, loss of consortium, and reasonable costs and attorneys fees.

Dr. Parsley moves for summary judgment on the grounds that plaintiffs have failed to present evidence of general or proximate causation.  Plaintiffs oppose the motion, contending that they have provided sufficient evidence of causation.

## II.  Motion for Summary judgment

A.  Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to

support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

4

B.  Medical Malpractice

Plaintiffs' medical malpractice claim arises under West Virginia Code § 55-7B-3, which establishes the following elements of proof in a lawsuit against a health care provider:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

Id.; see also Mays v. Chang, 579 S.E.2d 561, 565 (W. Va. 2003) ("It is axiomatic that in a medical malpractice lawsuit . . . , a plaintiff must establish that the defendant doctor deviated from some standard of care, and that the deviation was 'a proximate cause' of the plaintiff's injury" (citing W. Va. Code § 55-7B)). The West Virginia Supreme Court has explained that "[t]he phrase 'a proximate cause' in W. Va. Code, 55-7B-3 'must be understood to be that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred.'" Mays, 579 S.E.2d at 565 (quoting Syl. Pt. 3, Webb v. Sessler, 63 S.E.2d 65 (1950)). Generally speaking, "[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such

5

issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Id. at Syl. Pt. 2 (quoting Syl. Pt. 5, Hatten v. Mason Realty Co., 135 S.E.2d 236 (W. Va. 1964)).

1. General Causation

Dr. Parsley first contends that plaintiffs' claim fails because they have offered no evidence of general causation (i.e., that metoclopramide is capable of causing tardive dyskinesia in the general population). In response, plaintiffs point to the affidavit of their expert Suzanne Parisian, M.D., in which Dr. Parisian opines to a reasonable degree of medical certainty that the ingestion of metoclopramide generally causes involuntary movement disorders including tardive dyskinesia. (See Pls.' Opp., Ex. 2, Dr. Parisian's Affidavit).

Dr. Parsley nevertheless makes reference to the court's November 24, 2010 memorandum opinion and order dismissing PLIVA from this action, where it was stated that, "[i]n a pharmaceutical products liability action, a plaintiff must initially establish both general and specific causation for his injuries." (Doc. No. 187, at 12). Noting that one of the alternative grounds on which the court dismissed PLIVA was the

6

lack of general causation evidence, Dr. Parsley claims the same result should be reached here inasmuch as the general causation issue with regard to each PLIVA and Dr. Parsley is identical. (Def.'s Reply at 6).  This argument fails for an obvious reason. Dr. Parisian's affidavit regarding general causation, dated December 17, 2010, was not tendered in opposition to PLIVA's motion for summary judgment, and thus was not considered by the court in its November 24, 2010 memorandum opinion and order granting summary judgment to PLIVA on general and proximate causation grounds.  Now, viewing the affidavit for the first time, it raises a genuine issue of fact as to whether metoclopramide causes tardive dyskinesia in the general population.

    2.    Proximate Cause

A more substantial argument raised by Dr. Parsley concerns proximate cause.  At this point, it is important to understand the nature of plaintiffs' medical malpractice claim. Plaintiffs assert that Dr. Parsley breached a standard of care by (1) prescribing metoclopramide to Meade without adequately, if at all, discussing the risk of tardive dyskinesia, and (2) failing to perform, during the course of treatment with metoclopramide, adequate neurological exams on Meade designed to detect movement

disorder symptoms.[2]  They further maintain that the foregoing acts and omissions proximately caused Meade to develop tardive dyskinesia.  As evidence of Dr. Parsley's negligence, plaintiffs rely primarily on the expert report of Ray Mahoubi, M.D.  That report states in pertinent part as follows:

> It is my medical opinion that Dr. Parsley fell below the standard of care in regards to the care she gave Mrs. Meade.  Reglan[3] was originally prescribed by Dr. Parsley for Mrs. Meade on 1/18/2006 for nausea.  There is no indication that at any time during this office visit that Dr. Parsley discussed the potential complications of long term Reglan use with Mrs. Meade.  Reglan is not a drug that should be prescribed casually because of the complications that arise with its long term use, and the initial prescribing of the Reglan is questionable.  Dr. Parsley saw the patient in follow-up at least 6 additional times over the course of the next thirteen months, all the while maintaining the patient on Reglan. During these subsequent visits, there is little, if any, mention of the Reglan or any indication that an adequate neurological exam was performed, as is mandatory for any patient taking Reglan.  Dr. Parsley's failure to perform and/or document an adequate neurological exam is below the standard of care as well.
>
> As Reglan is not appropriate for long term use, during each consequent visit that Mrs. Meade had with Dr. Parsley, every effort should have been made to determine if the Reglan could be discontinued.  Instead, numerous prescriptions for Reglan were written by Dr. Parsley over the course of this approximately 13 month period.  Dr. Parsley shows little understanding of the potential

---

[2]   Plaintiffs also contend that Dr. Parsley was negligent in failing to adequately note in her records what she did or did not do, or discuss, in office visits with Meade.  While the allegedly inadequate records might tend to show some carelessness on the part of Dr. Parsley, it is not a basis for a medical malpractice action in itself.

[3]   Reglan is the brand name version of metoclopramide.

>  neurological complications of Reglan use, as is indicated by her notes from Mrs. Meade's visit on 3/8/07, where she observed that Mrs. Meade was demonstrating tremors. Instead of identifying that Mrs. Meade's symptoms could possibly have been caused by her long term use of Reglan, Dr. Parsley chose instead to prescribe Sinamet.
>
>  In summary Dr. Parsley deviated from the applicable standard of care by prescribing Mrs. Meade the drug Reglan for "nausea" and for not adequately monitoring the patient for side effects while she continued on Reglan, as well as for the long-term off-label use in this high risk patient. The risk of developing Tardive Dyskinesia increases with the duration of exposure to Reglan, as well as with age and female gender. It is my opinion that as a direct result of Dr. Parsley's failure to adhere to the applicable standard of care, Mrs. Meade developed Tardive Dyskinesia, as has been documented in her medical records.
>
>  I hold all of my opinions with a reasonable degree of medical probability.

(Pls.' Opp., Ex. 6, Expert Report of Dr. Mahoubi at 2-3).

Dr. Mahoubi later opined in a deposition that putting "a patient on a potential toxic drug like Reglan for [the] period of time that [Meade] was on it and [failing to] adequately perform and document a neurological exam is below the standard of care." (Pls.' Opp., Ex. 7, Dr. Mahoubi Dep. at 61). Explaining the type of neurological exam that should be performed on a patient undergoing a metoclopramide regimen, Dr. Mahoubi testified as follows:

>  [I]n addition to just eyeballing them or just looking at them, you want to check them for tremors, subtle tremors, which can only sometimes be manifested when you have them hold their hands out and try to hold steady. Of course checking their gait, seeing how they walk, seeing if they

9

>  are displaying anything that could be an early sign of Parkinsonism such as shuffling gait or a slow gait, short steps, any kind of repetitive-type movements of their arms, legs, hands, face, tongue, jaw, which may early on be subtle, which won't be picked up if you don't look for it. And of course checking their posture and things like that.

(Id. at 51). While acknowledging that Dr. Parsley conducted some neurological exams of Meade, Dr. Mahoubi testified that "she simply checkmarked normal," that "on at least three of the occasions there was, if I recall, no exam noted at all," and that "she wasn't doing thorough neuro exams each time." (Id. at 60, 63). He concluded that Dr. Parsley "didn't do appropriate [neurological] exams. She did not give [sic] informed consent. She did not document really any discussion of the drug itself, which you should do when you have somebody on Reglan." (Id. at 62).

In response to Dr. Mahoubi's report and testimony, Dr. Parsley emphasizes that she did perform neurological exams of Meade on February 8 and February 20, 2007, and that both tests proved negative. (See Def.'s Mot. Summ. J., Ex. B, Dr. Parsley Med. Records; Ex. E, Dr. Parsley Dep. at 155). She further claims that Meade did not start exhibiting movement disorder symptoms until February 27, 2007, when Meade saw Dr. Patnaik, being _after_ she had been examined in February 2007 by Dr. Parsley. (Def.'s Mem. at 7). Dr. Parsley thus contends that her

10

alleged failure to adequately conduct neurological exams during previous visits could not have been a proximate cause of Meade's injuries because "there was nothing to recognize or diagnose prior to February 27, 2007."  (Def.'s Reply at 7).

Dr. Parsley's assertion regarding the timing of Meade's movement disorder symptoms conflicts with the deposition testimony of Meade's daughter, Tammie Vance.  Dr. Parsley cites Vance's deposition in support of the proposition that the "uncontradicted testimony is that Mrs. Meade first began showing signs of alleged movement disorder in late February 2007." (Def.'s Mem. at 7).  However, Vance actually testified that she first noticed her mother's involuntary movements in the "first part of February of '07."  (Def.'s Mot. Summ. J., Ex. F, Vance Dep. at 128-29).  This testimony indicates that Meade was exhibiting facial tremors prior to her February 20, 2007 visit with Dr. Parsley, a visit where Dr. Parsley conducted a neurological exam on Meade that was supposed to detect movement disorder symptoms but, Dr. Parsley says, did not.

To summarize, then, there is evidence in the record showing that (1) Meade exhibited movement disorder symptoms during the last month in which she was still being seen and treated by Dr. Parsley with metoclopramide; (2) Dr. Parsley failed to conduct neurological exams on some of the three visits

11

by Meade during the first twelve months of the metoclopramide regimen; and (3) the neurological exams that Dr. Parsley did conduct were inadequate and fell below the standard of care inasmuch as, allegedly, they were not designed to detect movement disorder symptoms in Meade.  Viewing this evidence in the light most favorable to the plaintiffs, a reasonable jury could find that Dr. Parsley's negligence was a proximate cause of Meade's injuries.[4]

### 3. Informed Consent

Plaintiffs' medical malpractice claim is based not only on allegedly inadequate neurological exams, but also on Dr. Parsley's alleged failure to obtain informed consent from Meade regarding the risks and benefits of metoclopramide.  In support of this theory, plaintiffs cite Dr. Mahoubi's expert report and deposition testimony, wherein he noted that Meade's medical

---

[4] Dr. Parsley also claims, in support of her proximate causation argument, that Dr. Mahoubi conceded that prescribing Reglan for certain purposes for longer than 12 weeks is not necessarily medical negligence, and the mere fact that a patient develops tardive dyskinesia while taking metoclopramide is not, by itself, evidence of medical negligence.  (Def.'s Mem. at 8-9). Setting aside whether this is an accurate characterization of Dr. Mahoubi's testimony, Dr. Parsley's arguments are irrelevant to proximate cause -- they instead relate to whether Dr. Parsley breached a duty of care.  As discussed above, though, Dr. Mahoubi has opined repeatedly that Dr. Parsley did breach a duty of care. Any internal conflicts that may be found in Dr. Mahoubi's testimony must be resolved in plaintiffs' favor on a motion for summary judgment.

12

records do not document any informed consent discussions with Meade. (See Pls.' Opp., Ex. 6, Expert Report of Dr. Mahoubi at 2; Ex. 7, Dr. Mahoubi Dep. at 62). Plaintiffs also rely on Vance's deposition testimony, in which she stated that she accompanied her mother to "every visit" with Dr. Parsley, and that she had no recollection of Dr. Parsley ever discussing the risks of ingesting metoclopramide with Meade. (Pls.' Opp., Ex. 8, Vance Dep. at 103-04, 110).

Dr. Parsley argues that plaintiffs' informed consent theory was not alleged in the complaint and that plaintiffs are foreclosed from pursuing it now. However, Count 1 of the complaint, the medical malpractice count, broadly alleges that Dr. Parsley was negligent in "failing to properly care for and treat the plaintiff." (Compl. ¶ 103). Although Count 1 goes on to outline a number of specific ways in which Dr. Parsley breached her duty of care, it also alleges generally that she acted negligently "[i]n such other and further particulars as may be ascertained through discovery." (Id.). As contemplated by this allegation, plaintiffs obtained evidence during discovery indicating that Dr. Parsley failed to obtain Meade's informed consent. The court has not been presented with a sufficient reason as to why plaintiffs should be prohibited from using this evidence in support of their medical malpractice claim.

13

Dr. Parsley next contends that plaintiffs' informed consent theory fails on proximate cause grounds inasmuch as there is no evidence showing that Meade would have refused the prescription of metoclopramide had she been adequately informed of the risks associated with the drug. She relies on <u>Adams v. El-Bash</u>, 338 S.E.2d 381 (W. Va. 1985), where the court stated as follows in Syllabus Point 3:

> In cases applying the doctrine of informed consent, where a physician fails to disclose the risks of surgery in accordance with the patient need standard of disclosure and the patient suffers an injury as a result of the surgery, a causal relationship, between such failure to disclose and damage to the patient, may be shown if <u>a reasonable person in the patient's circumstances</u> would have refused to consent to the surgery had the risks been properly disclosed.

<u>Id.</u> (emphasis added). As the emphasized language indicates, the <u>Adams</u> causation standard is an objective one, looking at whether a reasonable person would have refused to consent if the risks had been adequately disclosed. <u>See</u> <u>id.</u> at 386. The court in <u>Adams</u> added that, under this "objective test," the "question of causation . . . [is] properly left for the jury to decide."[5] <u>Id.</u>

---

[5] Apart from <u>Adams</u>, if Meade herself would have chosen to take the drug anyway, even in the face of an adequate explanation, the risk of injury prior to detection by an adequately and routinely performed neurological exam would seem to fall on Meade.

14

III. Conclusion

Having found genuine issues of material fact as to whether Dr. Parsley breached a standard of care and whether that breach was a proximate cause of Meade's injuries, the court ORDERS that Dr. Parsley's motion for summary judgment be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: May 25, 2011

John T. Copenhaver, Jr.
United States District Judge